# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| JACKIE O. FLEMING, ) | |
|     Plaintiff ) | |
| v. ) | Civil Action No. 2:17cv00038 |
| ) | **MEMORANDUM OPINION** |
| NANCY A. BERRYHILL, ) | |
| **Acting Commissioner of** ) | |
| **Social Security,** ) | |
|     Defendant ) | By:   PAMELA MEADE SARGENT |
| ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Jackie O. Fleming, ("Fleming"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 *et seq.* (West 2011 & 2018 Supp.). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). The case is before the undersigned magistrate judge upon transfer by consent of the parties, pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642

(4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Fleming protectively filed his application for DIB on November 26, 2013, alleging disability as of February 18, 2013, based on rheumatoid arthritis in right knee, diabetes, depression, anxiety, memory and concentration difficulties and difficulty sleeping. (Record, ("R."), at 17, 186-87, 204, 208, 237, 239, 260.) The claim was denied initially and upon reconsideration. (R. at 78-86, 88-100, 106-08, 113-15.) Fleming then requested a hearing before an administrative law judge, ("ALJ"). (R. at 117-18.) The ALJ held a hearing on June 9, 2016, at which Fleming was represented by counsel. (R. at 41-77.)

By decision dated August 31, 2016, the ALJ denied Fleming's claim. (R. at 17-33.) The ALJ found that Fleming met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2018. (R. at 9.) The ALJ found that Fleming had not engaged in substantial gainful activity since February 18, 2013, the alleged onset date.[1] (R. at 19.) The ALJ found that, through the date of her decision, the medical evidence established that Fleming had severe impairments, namely obesity; diabetes mellitus; right knee meniscal tear and degenerative joint disease/osteoarthritis status-post surgery with acute venous embolism and thrombosis status-post knee arthroscopy; rheumatoid arthritis; history of obstructive sleep apnea; depressive disorder; and mood disorder, but she found that Fleming did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404,

---

[1] Therefore, Fleming must show that he was disabled between February 18, 2013, the alleged onset date, and August 31, 2016, the date of the ALJ's decision, in order to be eligible for benefits.

Subpart P, Appendix 1. (R. at 19-22.) The ALJ found that, through the date of her decision, Fleming had the residual functional capacity to perform light work[2] that required no more than standing and walking for 90 minutes at a time or a total of four hours and sitting for a total of six hours in an eight-hour workday, occasional pushing and pulling with his lower extremities, climbing of ramps and stairs, balancing, kneeling, stooping and crouching with no crawling, exposure to hazardous machinery, working at unprotected heights, climbing ladders, ropes or scaffolds, working on vibrating surfaces, concentrated exposure to extremely cold temperatures, excess humidity or pulmonary irritants or driving. (R. at 22-23.) The ALJ also found that Fleming was limited to no more than frequent required use of hand controls with an option to change positions between sitting and standing every 90 minutes briefly and in place without leaving the work station. (R. at 23.) He also found that Fleming was able to understand, remember and carry out simple instructions in repetitive, unskilled work and respond appropriately to supervision, co-workers and usual work situations, but limited to only occasional interaction with the general public, co-workers and supervisors. (R. at 23.) The ALJ found that Fleming was unable to perform his past relevant work. (R. at 31.) Based on Fleming's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Fleming could perform, including jobs as a nonpostal mail clerk, a hand packer and a production inspector. (R. at 31-32) Thus, the ALJ concluded that Fleming was not under a disability as defined by the Act, and was not eligible for DIB benefits. (R. at 32-33.) *See* 20 C.F.R. § 404.1520(g) (2018).

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2018).

After the ALJ issued his decision, Fleming pursued his administrative appeals, (R. at 183), but the Appeals Council denied his request for review. (R. at 1-5.) Fleming then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2018). This case is before this court on Fleming's motion for summary judgment filed March 9, 2018, and the Commissioner's motion for summary judgment filed April 9, 2018.

## II. Facts

Fleming was born in 1970, (R. at 50, 186), which classified him as a "younger person" under 20 C.F.R. § 404.1563(c) at the time of the ALJ's decision. Fleming has a high-school education and past work experience as a sheriff's deputy and an equipment operator. (R. at 46, 50.) Fleming testified that, since undergoing gastric bypass surgery, he no longer suffered from diabetes, hypertension, elevated cholesterol or sleep apnea. (R. at 51, 55.) Fleming stated that he used a cane to walk most of the time. (R. at 52-53.) Fleming testified that he could walk only 30 yards without stopping and could sit for only 5-15 minutes and stand for only 10 minutes before needing to change positions. (R. at 53.) Fleming said that he could lift only eight pounds comfortably. (R. at 55.) Fleming stated that he developed a deep vein thrombosis, or blot clot, after knee surgery. (R. at 53.) Fleming said he also had been diagnosed with rheumatoid arthritis. (R. at 54.)

Fleming testified that he took a number of medications, which made him drowsy and unsteady on his feet when he stood up. (R. at 55.) He also said that he stayed angry and depressed with mood swings and was irritable. (R. at 56, 61.) He said that he could not sleep and would cry easily. (R. at 61.) He said that he had no

energy. (R. at 62.) Fleming stated that he drove on occasion, but only for short distances. (R. at 58.) Fleming testified that he was in too much pain to work. (R. at 59.) He said that he was in constant pain in his hands, feet, back and neck. (R. at 59.) Fleming said that he spent most of his days seated in a recliner with his feet elevated. (R. at 59.) Fleming said that his daily pain level was an 8 on a 10-point scale. (R. at 60.) Fleming also said that his fingers stayed numb constantly. (R. at 60.)

Barry Hensley, a vocational expert, also was present and testified at Fleming's hearing. (R. at 64-74.) Hensley classified Fleming's past work as a deputy sheriff and as a heavy equipment operator as medium[3] and skilled. (R. at 65.) Hensley was asked to consider a hypothetical individual of Fleming's age, education and work history, who could perform light work that did not require more than 90 minutes of walking at a time or four hours total of standing and walking and six hours of sitting in an eight-hour workday, with the need to change positions between sitting and standing every 90 minutes, briefly without leaving the workstation, and no crawling, exposure to hazardous machinery, working at unprotected heights, climbing ladders, ropes or scaffolds or working on vibrating surfaces. (R. at 66.) Hensley was asked to consider an individual whose pushing and pulling with the lower extremities was limited to occasional with an occasional ability to climb ramps and stairs, balance, kneel, stoop and crouch and who needed to avoid concentrated exposure to extreme cold temperatures, excess humidity and pulmonary irritants, but who was able to understand, remember and carry out simple instructions in repetitive unskilled work and respond appropriately to supervision, co-workers and usual work situations that involved only occasional

---

[3] Medium work involves lifting items weighing up to 50 pounds at a time and frequently lifting and carrying items weighing up to 25 pounds. If someone can do medium work, he also can do light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2018).

interactions with the general public, co-workers and supervisors. (R. at 66-67.) Hensley testified that such an individual could not perform Fleming's past work, but could perform other work existing in significant numbers in the national economy, including jobs as a nonpostal mail clerk, a hand packer and a production inspector. (R. at 67-68.) Hensley testified that an individual who was off task 11 to 20 percent of the time could not perform any work. (R. at 70.) Hensley also stated that there would be no jobs that an individual who was unable to use his hands at least one-third of the workday could perform. (R. at 71.) He also said there would be no jobs available for a person who missed work more than two days a month. (R. at 71-72.) He also said that, if a person was unable to stoop, he could not work. (R. at 73.)

In rendering her decision, the ALJ reviewed records from Wellmont Lonesome Pine Hospital; Franklin Woods Community Hospital; Dr. Kevin Blackwell, D.O.; Mountain States Rehabilitation; Johnston Memorial Hospital; Wellmont Holston Valley Medical Center; University of Virginia, ("UVA"), Hospital; Dr. Timothy McGarry, M.D.; Dr. Maurice Nida, D.O.; Southwest Virginia Outpatient Center; Blue Ridge Orthopedics & Sports Medicine; Charles E. Williams, Jr., P.T.; Dr. Andrew Kramer, D.O.; Dr. Rene L. Brown, D.O.; Patrick Farley, Ed.D.; Wellmont Medical Associates; Cavalier Pharmacy; Dr. Richard Surrusco, M.D., a state agency physician; Dr. R. S. Kadian, M.D., a state agency physician; and Dr. David Lurie, M.D.

The evidence of record contains numerous opinions regarding Fleming's residual functional capacity. On October 28, 2013, Dr. Maurice Nida, D.O., completed a Physician's Report for Fleming for the Virginia Retirement System. (R. at 716-19.) On this Report, Dr. Nida stated that Fleming was unable to lift, bend, sit, stand or walk for long periods of time due to joint pain, joint swelling,

joint redness and morning stiffness. (R. at 716.) Dr. Nida said that symptoms were present in Fleming's feet, hands, wrists, shoulders and neck. (R. at 716.) Dr. Nida stated that Fleming suffered from rheumatoid arthritis and had been referred to a rheumatology specialist. (R. at 716.) Dr. Nida stated that Fleming's condition had worsened over the previous year. (R. at 717.) Dr. Nida checked a box, indicating that he considered Fleming permanently disabled from performing his usual work duties. (R. at 717.)

From the record, it appears that Dr. Nida, or residents with his office, have treated Fleming since as early as July 26, 2012. (R. at 779-81.) In July 2012, Dr. Nida noted that Fleming suffered from diabetes mellitus and hyperlipidemia. (R. at 779.) Fleming denied any joint pain, anxiety or depression at that time. (R. at 779.) On October 29, 2012, Fleming complained of pain in his left knee from arthritis. (R. at 774.) On January 10, 2013, Fleming complained of stress and being nervous. (R. at 768.) On April 1, 2013, Fleming complained of pain, swelling, warmth and tenderness in his left hand. (R. at 763.) On April 16, 2013, Fleming complained of joint pain, swelling and stiffness in his shoulders, wrists, knees and hands. (R. at 759.) Fleming was diagnosed with rheumatoid arthritis in May 2013 by Dr. Michael Indelicato, D.O., a rheumatology fellow with the UVA Hospital. (R. at 665-73.)

Dr. Rene L. Brown, D.O., saw Fleming on March 19, 2014, for complaints of dizziness, light-headedness and loss of consciousness upon standing. (R. at 887-90.) Fleming denied any problem with depression, and Dr. Brown noted that Fleming was not nervous or anxious. (R. at 888.) She also noted that Fleming had normal musculoskeletal range of motion with no edema or tenderness. (R. at 888.) Fleming saw Dr. Brown on June 12, 2014, with complaints of an aching and stabbing pain in his left knee. (R. at 1025-30.) Dr. Brown noted a loss of motion

and joint swelling. (R. at 1026, 1028.) She noted that Fleming was not depressed, nervous or anxious, with normal mood and affect. (R. at 1027, 1028.)

On March 27, 2014, Dr. Richard Surrusco, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment on Fleming. (R. at 82-84.) Dr. Surrusco stated that Fleming was capable of occasionally lifting and/or carrying items weighing up to 20 pounds and frequently lifting and/or carrying items weighing up to 10 pounds. (R. at 82.) He said that Fleming could stand and walk for a total of four hours and sit for a total of six hours in an eight-hour workday. (R. at 83.) Dr. Surrusco said that Fleming's ability to push and pull was limited in his lower extremities and that he was limited to occasional climbing of ramps, stairs, ladders, ropes and scaffolds and crouching and frequent balancing, stooping, kneeling and crawling. (R. at 83.) He stated that Fleming should avoid concentrated exposure to work hazards, such as machinery and heights. (R. at 84.)

Dr. Timothy G. McGarry, M.D., completed a Physician's Report on Fleming for the Virginia Retirement System on April 12, 2014. (R. at 995-98.) On this Report, Dr. McGarry stated that Fleming was limited in his ability to sit/stand/walk for greater than 90 minutes at a time; therefore, he stated that Fleming must be able to change positions every 90 minutes to obtain comfort. (R. at 995.) Dr. McGarry stated that he had treated Fleming since January 2013 and had performed arthroscopic surgery on Fleming's right knee in February 2013, and had administered Orthovisc injections. (R. at 995-96.) He said that Fleming continued to suffer from pain, stiffness and limited range of motion in his knees. (R. at 995.) Dr. McGarry checked a box stating that he considered Fleming permanently disabled from performing his usual work duties. (R. at 996.)

The record shows that Dr. McGarry first saw Fleming on January 30, 2013, for a work-related injury to his right knee. (R. at 467-69.) Dr. McGarry noted that

Fleming had ongoing problems with his left knee, but he hurt the right knee when he stepped in a hole on January 10, 2013. (R. at 467.) Fleming complained of constant sharp pain, periodic swelling, catching and locking in his right knee. (R. at 467.) Dr. McGarry diagnosed early degenerative joint disease with a complex posterior horn medial meniscal tear. (R. at 468.) Dr. McGarry recommended arthroscopic surgery, which he performed on February 19, 2013. (R. at 469, 482-83, 808-11.) The record also shows that, post-surgery, Fleming developed a deep vein thrombosis that was treated with blood thinners. (R. at 513, 801.)

Charles E. Williams, Jr., P.T., performed a Functional Capacity Evaluation of Fleming at Dr. McGarry's request on March 13, 2014. (R. at 844-63.) Williams said that Fleming displayed a slow pace and right limp when walking. (R. at 860.) Williams said that Fleming did not demonstrate the physical mobility requirements to return to his job as a deputy sheriff due to significant limitations with walking, climbing steps and assuming and recovering from low level positions. (R. at 846-47.) Williams said that Fleming's longest duration of sitting was 1 hour and 17 minutes, longest duration of static standing was 27 minutes and longest duration of standing and walking was 51 minutes. (R. at 847.)

Dr. R. S. Kadian, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment on Fleming on August 20, 2014. (R. at 96-97.) Dr. Kadian stated that Fleming was capable of occasionally lifting and/or carrying items weighing up to 20 pounds and frequently lifting and/or carrying items weighing up to 10 pounds. (R. at 96.) He said that Fleming could stand and walk for a total of six hours and sit for a total of six hours in an eight-hour workday. (R. at 96.) Dr. Kadian said that Fleming's ability to push and pull was limited in his lower extremities and that he was limited to occasional climbing of ramps, stairs, ladders, ropes and scaffolds and crouching and frequent balancing,

stooping, kneeling and crawling. (R. at 96-97.) He stated that Fleming should avoid concentrated exposure to work hazards, such as machinery and heights. (R. at 97.)

Dr. Brown completed an Assessment Of Ability To Do Work-Related Activities (Physical) form on Fleming on September 25, 2014. (R. at 1007-09.) On this form, Dr. Brown stated that Fleming was limited to lifting items weighing up to 5 pounds based on his rheumatoid arthritis with large joint involvement. (R. at 1007.) Dr. Brown stated that Fleming could stand and walk only 30 minutes at a time and up to four hours and sit for only 30 minutes at a time and up to five hours in an eight-hour workday. (R. at 1007-08.) Dr. Brown stated that Fleming could not climb, stoop, kneel, balance, crouch or crawl and that his abilities to reach, to handle and to push/pull were affected by his impairment. (R. at 1008.) Dr. Brown stated that Fleming should not work around moving machinery, temperature extremes, chemicals, fumes, humidity or vibration. (R. at 1009.) Dr. Brown also stated that Fleming's impairments would cause him to miss work more than two days a month. (R. at 1009.)

The medical evidence of record shows that Dr. Brown examined Fleming on this date for an "Annual Exam." (R. at 1012-16.) Dr. Brown noted that Fleming complained of fatigue and pain, stiffness, joint swelling and joint warmth in his hands, wrists, knees, hips and shoulders. (R. at 1012.) Fleming reported that his symptoms had been "stable." (R. at 1012.) Fleming said that activity, exposure to cold air, descending stairs, climbing stairs, lifting, gripping and sitting aggravated his symptoms. (R. at 1012.) Dr. Brown also noted that Fleming suffered from hypertension and diabetes mellitus, but he denied any anxiety, headaches, palpitations, peripheral edema or shortness of breath. (R. at 1012.) Fleming also

complained of depressed mood, difficulty concentrating, fatigue and insomnia for the previous year. (R. at 1012.)

Despite earlier stating that Fleming denied any anxiety, Dr. Brown noted that Fleming was nervous/anxious at another point in her note. (R. at 1014.) She also stated that he appeared "distressed" without elaborating. (R. at 1015.) At one point, Dr. Brown noted that Fleming's physical examination revealed no edema or tenderness in any of his joints. (R. at 1015.) Dr. Brown, at another point, noted decreased range of motion in Fleming's shoulders with pain, decreased range of motion in his knees with tenderness and swelling in the right knee, decreased range of motion in his hands with tenderness and decreased strength and pain and spasm in his back. (R. at 1015.) Despite her earlier notes and Fleming's complaints, Dr. Brown stated that Fleming's mood and affect were normal. (R. at 1015.) She noted that Fleming was taking Prozac. (R. at 1013.)

A couple of weeks earlier, on September 8, 2014, Dr. Brown noted that Fleming denied fatigue. (R. at 1017.) Later in the report, Dr. Brown noted that Fleming complained of fatigue. (R. at 1019.) Dr. Brown stated that Fleming complained of depression, but he was not nervous/anxious. (R. at 1019.) Later in that same note, Dr. Brown stated that Fleming had a "normal mood and affect." (R. at 1020.) The same inconsistencies appear in Dr. Brown's August 11, 2014, note, except that Dr. Brown noted that Fleming did not suffer from depression. (R. at 1021-25.) On December 8, 2014, Dr. Brown noted stable complaints of pain, stiffness, joint swelling and warmth and fatigue. (R. at 1077.) Dr. Brown, again, noted that Fleming was not depressed, nervous or anxious, with normal mood and affect. (R. at 1079, 1080.) Nevertheless, Dr. Brown's note stated that Fleming was taking Prozac. (R. at 1078.) Dr. Brown noted decreased range of motion and pain in Fleming's shoulders, decreased range of motion, swelling and tenderness in his right knee, decreased range of motion and tenderness in his left knee, decreased

range of motion, tenderness and decreased strength in his hands and tenderness and swelling in his right lower leg. (R. at 1079.) She noted pain and spasm in Fleming's back. (R. at 1079.)

Dr. McGarry treated Fleming for continuing complaints of pain in his right knee through February 11, 2016. (R. at 785-814, 825-42, 1001-04, 1098-1107, 1217-29.) During this period of time, Dr. McGarry administered three series of Orthovisc injections to Fleming's right knee. (R. at 1217-29.) On May 22, 2013, Fleming complained of significant pain and swelling in all of his joints. (R at 799.) On September 4, 2014, Fleming complained of mild aching pain and swelling. (R. at 1106.) Dr. McGarry noted that Fleming walked with no appreciable limp. (R. at 1106.) He said that Fleming's range of motion in his right knee was "just short of full extension…." (R. at 1106-07.) On September 11 and 22, 2014, May 6 and 13 2015, and February 4 and 11, 2016, Dr. McGarry noted no edema, erythema or ecchymosis, no tenderness and no signs of instability in Fleming's right knee with good range of motion, good motor strength and no decreased sensation. (R. at 1102, 1104, 1217, 1219, 1226, 1228.) On September 11 and 22, 2014, April 29 and May 13, 2015, and February 4 and 11, 2016, Fleming denied suffering from any fatigue, and Dr. McGarry noted that he was in no acute distress. (R. at 1098, 1102, 1104, 1217, 1226.) On January 28, 2106, Dr. McGarry noted that Fleming walked with a slight limp on the right side. (R. at 1221.) Dr. McGarry also noted range of motion just short of full extension in Fleming's right knee with mild crepitus of the patellofemoral joint, no ligamentous laxity and good motor strength. (R. at 1221-22.)

On April 19, 2015, Patrick N. Farley, Ed.D., a licensed professional counselor, completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) on Fleming. (R. at 1047-49.) On this form, Farley stated that

Fleming had no limitation in his ability to maintain personal appearance. (R. at 1048.) He also stated that Fleming's abilities to follow work rules, to interact with supervisors, to understand, remember and carry out simple job instructions, to behave in an emotionally stable manner and to relate predictably in social situations were satisfactory. (R. at 1047-48.) In all other occupational, performance and personal/social adjustments, Farley stated that Fleming had either an unsatisfactory ability or no useful ability. (R. at 1047-49.) Farley also wrote that Fleming's symptoms and impairments prevented him from effectively managing day to day stressors in the workplace. (R. at 1049.) He stated that Fleming would be absent from work more than two days a month due to his impairments and treatment. (R. at 1049.) Farley completed another Medical Assessment Of Ability To Do Work-Related Activities (Mental) on Fleming on March 9, 2016. (R. at 1241-43.) His findings were the same on this assessment as the earlier one, except that he stated that Fleming's ability to understand, remember and carry out simple job instructions was unsatisfactory. (R. at 1242.)

The medical evidence shows that Fleming first treated with Farley on September 22, 2014, for complaints of depression, anxiety and pain management issues. (R. at 1037-39.) Fleming also complained of diminished concentration, memory problems, increased irritability, occasional crying, helplessness and hopelessness, low energy, anhedonia, social withdrawal, insomnia, diminished self-esteem and constant pain. (R. at 1037.) Fleming said that he felt anxious and restless, and he worried constantly. (R. at 1037.) Fleming reported that he last worked on February 18, 2013, when he tore meniscus in his right knee while at the police academy. (R. at 1037.) Fleming said that his right knee swelled daily and hurt constantly. (R. at 1037.) He placed his pain at an 8 or 9 on a 10-point scale. (R. at 1037.) Fleming complained that he could not sit, stand or lie down for very long without increasing his pain. (R. at 1037.)

Farley noted that Fleming appeared to be of average intelligence with rational and coherent thought content and full affect, he was oriented, and he was moderately impaired in short-term memory and concentration. (R. at 1038.) Farley diagnosed Fleming with major depression, recurrent, moderate; and a mood disorder. (R. at 1038.) He assessed Fleming's then-current Global Assessment of Functioning, ("GAF")[4], score at 50.[5] Farley stated that Fleming's prognosis was guarded and recommended individual psychotherapy for six to 12 months, perhaps longer. (R. at 1038.) Farley also recommended that Fleming speak to his primary care physician about increasing his antidepressant. (R. at 1038.) Farley stated that Fleming was unable to maintain gainful employment due to the combination of his pain and psychological symptoms. (R. at 1038.) He also said that Fleming's psychological symptoms, alone, would preclude Fleming returning to employment. (R. at 1038-39.)

The evidence of record shows that Fleming saw Farley on a monthly basis from October 2014 to June 2016. (R. at 1040-45, 1135-38, 1235-39, 1271-72, 1280.) During this period of time, Farley continued to assess Fleming's GAF score at 50. (R. at 1040-45, 1135-38, 1235-39, 1271-72, 1280.)

Dr. Brown saw Fleming again on January 6, 2015, February 12, 2015, March 24, 2015, and April 27, 2015. (R. at 1051-55, 1057-60, 1064-67, 1069-73.) On each of these occasions, Dr. Brown noted that Fleming was not suffering from

---

[4] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[5] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

depression and/or was not nervous or anxious at that time. (R. at 1053, 1058, 1065, 1071.) Dr. Brown did note that medication had improved Fleming's activity and mental health on April 27, 2015. (R. at 1052.) She also noted swelling in Fleming's right elbow and both knees and feet on April 27, 2015. (R. at 1053.)

Fleming saw Dr. Anthony R. Yount, D.O., on May 19, 2015, for complaints of neck pain. (R. at 1110-14.) Dr. Yount noted no joint swelling and no agitation with normal mood. (R. at 1112-13.) Fleming saw Dr. Anthony Pang-Ng, D.O., on August 5, 2015, for pain, stiffness and swelling in his joints. (R. at 1115.) Dr. Pang-Ng noted that Fleming was not nervous/anxious, had normal musculoskeletal range of motion with no tenderness, but with edema in his right leg. (R. at 1117-18.) Dr. Pang-Ng saw Fleming again the next day and noted normal musculoskeletal range of motion with no edema or tenderness. (R. at 1124.) He also noted Fleming had a normal mood and affect and was not nervous or anxious. (R. at 1123-24.)

Dr. Pang-Ng saw Fleming again on February 25, 2016, noting that Fleming's depression medication recently had been changed. (R. at 1258-64.) Dr. Pang-Ng noted that Fleming's symptom control was good. (R. at 1258.) Dr. Pang-Ng stated that Fleming suffered from depression, chronic pain and an anxiety disorder, but he also stated that Fleming was not nervous/anxious. (R. at 1258, 1261.) He noted that Fleming denied suffering from any fatigue. (R. at 1259.) He also noted that Fleming had normal musculoskeletal range of motion and no edema or tenderness. (R. at 1262.)

Dr. Nida completed an Assessment Of Ability To Do Work-Related Activities (Physical) form on Fleming on September 24, 2015. (R. at 1140-42.) On this form, Dr. Nida stated that Fleming was limited to lifting items weighing up to

5 pounds based on his rheumatoid arthritis with large joint involvement. (R. at 1140.) Dr. Nida stated that Fleming could stand and walk only 30 minutes at a time and up to four hours and sit for only 30 minutes at a time and up to five hours in an eight-hour workday. (R. at 1140-41.) Dr. Nida stated that Fleming could not climb, stoop, kneel, balance, crouch or crawl and that his abilities to reach, to handle and to push/pull were affected by his impairment. (R. at 1141.) Dr. Nida stated that Fleming should not work around moving machinery, temperature extremes, chemicals, fumes, humidity or vibration. (R. at 1142.) Dr. Nida also stated that Fleming's impairments would cause him to miss work more than two days a month. (R. at 1142.) Dr. Nida stated that Fleming's work-related abilities were limited because of joint pain and swelling in his hands, feet, shoulders, knees and back. (R. at 1141.) Dr. Nida completed another Assessment Of Ability To Do Work-Related Activities (Physical) form on Fleming on February 24, 2016, containing opinions identical to his September 2015 assessment. (R. at 1231-33.) On June 8, 2016, Dr. Nida signed a prepared statement which said that Fleming's condition met or equaled the listed impairment, found at Part 404 Subpart P, Appendix 1, § 14.09(A), for inflammatory arthritis. (R. at 1291.)

Dr. David P. Lurie, M.D., a rheumatologist, saw Fleming on August 21, 2015, November 24, 2015, and May 27, 2016. (R. at 1157-67, 1281-82.) Dr. Lurie diagnosed rheumatoid arthritis with significant component of fatigue. (R. at 1164.)

The evidence also shows that Fleming underwent gastric bypass surgery by Dr. Andrew P. Kramer, D.O., in November 2013, and, as a result, lost substantial amounts of weight. (R. at 720-25, 865-82, 1210-16.) Fleming also was hospitalized and treated for a rectal abscess in 2012. (R. at 295-337.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2018). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2018).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2011 & 2018 Supp.); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether

substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Fleming argues that substantial evidence does not support the ALJ's finding as to his residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-8.) While the ALJ recognized that Fleming suffered from a severe mental impairment, (R. at 19), she, nonetheless, rejected the opinion of Farley as to Fleming's mental residual functional capacity. (R. at 28-29.) The ALJ rejected Farley's opinions because they were presented in the form of a checkmark list. (R. at 29.) This does not, however, explain why the ALJ also necessarily discredited the limitations Farley outlined in his narrative reports. For instance, on his initial evaluation, Farley documented that Fleming's short-term memory and concentration appeared moderately impaired. (R. at 1038.) Also, Farley stated that Fleming's psychological symptoms prevented him from working. (R. at 1038-39.)

The ALJ found that Fleming had that mental residual functional capacity to understand, remember and carry out simple instructions in repetitive, unskilled work with only occasional interaction with the general public, co-workers and supervisors. (R. at 23.) The problem with this finding is that the record is completely devoid of any psychological evidence to support it. There are no mental residual functional capacity assessments from state agency psychologists in the record. Nor is there any mental residual functional capacity assessment from any consultative examiner. Based on this, I cannot find that substantial evidence supports the ALJ's finding as to Fleming's mental residual functional capacity.

Therefore, I will vacate the Commissioner's decision denying benefits and remand Fleming's claim to the Commissioner for further development.

       **ENTERED:**       March 26, 2019.

                                    /s/ *Pamela Meade Sargent*
                                        UNITED STATES MAGISTRATE JUDGE